NOT DESIGNATED FOR PUBLICATION

Nos. 127,574
127,575

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interests of T.M. and H.S.-M.,
Minor Children.

MEMORANDUM OPINION

Appeal from Butler District Court; CHARLES M. HART, judge. Submitted without oral argument. Opinion filed January 24, 2025. Affirmed.

*Joshua S. Andrews*, of Cami R. Baker & Associates, P.A., of Augusta, for appellant natural mother.

*Devin H.S. Canfield*, assistant county attorney, for appellee.

Before ATCHESON, P.J., CLINE and PICKERING, JJ.

PER CURIAM: A.S. (Mother) appeals the district court's termination of her right to parent her two minor children, T.M. (born in 2018) and H.S.-M (born in 2021). On appeal Mother contends (1) her due process rights were violated when the district court failed to determine whether K.S.A. 60-414(a) or (b) applied, (2) there was insufficient evidence to support the district court's decision to terminate her rights, and (3) the district court abused its discretion in finding that termination was in the best interests of the children. Upon review, we find a rational fact-finder could have found it highly probable that Mother's parental rights should be terminated and that termination was in the children's best interests. Thus, we affirm.

1

FACTUAL AND PROCEDURAL BACKGROUND

H.S.-M. tested positive for amphetamines and cannabis at birth. Mother also tested positive. On June 3, 2021, the hospital notified the Butler County sheriff's office. When confronted with the drug test results, Mother denied amphetamine use but admitted to using marijuana. The medical records also suggested that there was no history of prenatal care for H.S.-M.

At that same time, the Butler County sheriff's office confirmed that Father had a warrant out for his arrest. They also had information that D.S. (born in 2011), Mother's eldest child, had been removed from the home in 2017 for allegations of neglect. Another allegation of neglect was affirmed by the Department for Children and Families (DCF) in 2019. Based on this information, a detective placed H.S.-M., T.M., and D.S. in protective custody. H.S.-M. and T.M. have the same biological father; D.S. has a different biological father and is, therefore, a half-sibling. This case does not involve D.S., who was reintegrated with her biological father in June 2022.

On June 7, 2021, the State filed petitions alleging the children were children in need of care (CINC). At the temporary custody hearing on June 8, 2021, the district court placed the children in the custody of the Secretary of DCF in out-of-home placement. On July 15, 2021, the court ordered the parents to obtain drug and alcohol evaluations, with visitation to occur only after two clean urinalysis (UA) drug tests.

The children were adjudicated CINC on September 28, 2021. The case plan goal was reintegration. The district court gave DCF and TFI, the agency that provides case management for foster care, discretion on whether and when to provide supervised visitation. Both parents were ordered to submit to regular hair follicle drug tests.

At a permanency hearing on May 5, 2022, the district court determined that reintegration was no longer viable "due to the mother moving into a house that is not appropriate to have the children in." The State filed a motion to terminate Mother's and Father's rights on October 25, 2022. The State's motion alleged that Mother continued to test positive for illegal substances throughout the case and that she did not obtain and maintain stable housing. The motion also alleged that Mother was to end her relationship with Father because he had not participated in the case plan tasks, but she failed to do so.

The district court held three days of evidentiary hearings on the State's motion to terminate parental rights: February 3, 2023; March 22, 2023; and July 14, 2023. A summary of the evidence presented follows.

First to testify was Melody Hogoboom, the Director of Operations at Assured Occupational Solutions, a drug and alcohol testing facility. Her facility drug tested Mother from June 8, 2021, through January 2023. She explained that hair follicle testing will capture drug use in the previous 90 days, while UAs capture drugs in the system up to around 72 hours later. In that way hair follicle tests can pick up drug usage that UAs miss.

Throughout the case Mother routinely submitted UAs that were negative for methamphetamine and hair follicle tests that were positive for methamphetamine for over 18 months. Between June 8, 2021, and January 13, 2023, all seven of Mother's hair follicle tests were positive for methamphetamine. On March 16, 2023, before the second day of trial, another hair follicle test was positive for methamphetamine. On June 16, 2023, before the third day of trial, another hair follicle test was positive for methamphetamine. At one point, Mother shaved her head in May 2022, telling TFI's case manager she did it "so [TFI] couldn't get any more positive hair follicles." Mother went in once on her own and paid for a hair follicle test herself on June 6, 2023, which was negative.

3

Mother submitted 68 UAs that were negative for methamphetamine between June 8, 2021, and January 18, 2023. She continued to have negative UAs in April, May, June, and July of 2023. Mother had a UA on June 29, 2021, that was positive for THC, and a UA on February 28, 2023, that was positive for hydrocodone and hydromorphone. Mother admitted to case workers that she had taken some prescription pills that she had left over from a couple of years ago.

Hogoboom testified that it was unusual but not unheard of for Mother to continue to have positive hair follicle tests and never have a UA that was positive for methamphetamine. Additionally, Mother failed to show for drug tests on August 19, 2021; February 8, 2022; April 12, 2022; June 23, 2022; and January 23, 2023. According to Hogoboom, a no-show is considered the same as a positive result.

Laura Sharp, a supervisor over the Outpatient Substance Abuse Program at Prairie View, testified next. Mother completed an outpatient substance use assessment on July 28, 2021, that recommended Level 1 outpatient treatment. According to her assessment, Mother reported first using methamphetamine when she was 20 years old, with regular use starting at 30 years old. She reported trying marijuana at age 16. For about a year, from September 2021 to October 2022, Mother attended group telehealth sessions by Zoom or by telephone. She never attended any of the sessions, group or individual, in person. Mother reported to Prairie View that she had been abstinent from illicit substances for a year. Sharp testified she did not know how to make sense of the negative UAs and the positive hair follicle tests and testified that Prairie View successfully discharged Mother from treatment.

TFI's case manager, Kristin Taliaferro, testified that she supervised the case from August 2021 through November 2022. Taliaferro reported that Mother and Father were living together in Burns, Kansas, when she took over the case. Taliaferro performed a walk-through of their house. She testified that it was not appropriate for reintegration for

various reasons, including the lack of flooring, broken glass on the floor, and no screens on the upstairs bedroom windows. Taliaferro offered to help Mother look for suitable housing and apply for income-based housing in El Dorado or other towns. Mother refused the assistance, stating, "[S]he did not want to live in El Dorado, and she wasn't going to move because she would not be able to take the dog."

Taliaferro never completed a second walk-through of the house because Mother had threatened to burn down Taliaferro's house and Taliaferro's supervisor felt it was unsafe for her to conduct a second walk-through. Ashlee Connor, a TFI parent partner, testified that Mother told her that she felt Taliaferro hated her and was out to ruin her life. Connor said Mother told her if Taliaferro's house were to burn down and her kids were to be taken from her, Mother would not be upset.

Jaylene Burge, a child protection specialist for the Newton DCF office, testified that she performed a walk-through of Mother's home in Burns. When asked specifically if the house was suitable for a 3-year-old, a 1-year-old, and a 10-year-old, Burge said, "At this time, for the 3-year-old, yes." On cross-examination she stated that DCF would defer to TFI on whether reintegration was appropriate.

As an explanation for her continued positive hair follicle tests, Mother told Taliaferro that she believed the home in Burns where she lived was possibly previously used to cook meth and, as a result, she was being exposed to meth in that environment. But Mother's sister and niece were also living in the same house, and their hair follicle tests were negative for methamphetamine. Mother requested some type of in-home testing, but TFI told her that it would not pay for such testing.

As of April 26, 2022, Mother and Father were still living together in Burns. Taliaferro had been telling Mother since September 2021 that her relationship with Father was impeding reintegration because Father was not participating in the case plan tasks

5

and had consistently tested positive for drug usage. In an addendum to her May 4, 2022 court report, Taliferro recommended the district court find reintegration no longer viable due to Mother's positive hair follicle tests and her continued relationship with Father.

Mother and Father lived separately after May 2022, but photographs were taken of Mother's truck outside Father's house on June 6, 2022, and case workers believed she still had contact with Father. Staisha Williamson, a permanency support worker for TFI, testified that while Mother was on the phone with a therapist on May 24, 2022, she told him that Father came to her house to mow her yard for her, and at one point Mother was in a vehicle with Father and they were "hotboxing," a term for smoking illegal substances with no way to escape the fumes.

During most of the case Mother was given weekly one-hour supervised visits. She only had two unsupervised visits—April 19 and April 26 of 2022. The visits returned to supervised because reintegration was found to be no longer viable at that time. Taliaferro testified regarding her concerns about Mother's behavior during visitation with the children. She said that Mother would very often tell D.S. that she was "a fatty or fat." Another case manager, Adriana Lyman, who supervised one visit with Mother and the children at a park in Winfield, testified about Mother's negative remarks about D.S.'s physical appearance.

Taliaferro testified that Mother spoke very negatively about TFI workers and therapists in front of the children. Taliaferro said Mother used foul and vulgar language in front of the children and spoke negatively of D.S.'s father in front of D.S. During a therapy session, with D.S. present, Mother referred to D.S.'s father as "'a piece of shit.'" On one occasion D.S. asked Mother what would happen if D.S. went to live with her father, and Mother replied: "'You wouldn't see your siblings as much.'" Mother also told D.S.: "'I don't know if your dad loves you.'"

Williamson testified that Mother said so many inappropriate things during visits that it was hard to keep up with them. On one visit Mother referred to H.S.-M. as "'Momma Lucifer.'" Williamson said Mother often called the children "'dorks.'" Williamson testified that her biggest concerns when supervising Mother's visitation with the children "were the excessive foul language and profanity for the entirety of the visit; the number of times that Mother . . . would have [D.S.] watch or be the caretaker of [H.S.-M.] . . . and it didn't appear that [T.M.] was actively communicating or cared to communicate with [Mother]." Taliaferro, Lyman, and Williamson also had concerns about Mother's judgment in keeping the children safe. On one occasion Mother gave H.S.-M. a chicken bone to chew on while she was teething but then left the room. The baby then choked on the bone. Williamson took the bone away from the baby, but Mother blamed her for allowing the baby to choke. At another visit Mother had D.S. watching H.S.-M. while Mother prepared food, and D.S. put the one-year-old child in a rolling office chair with a pillow propping her up. H.S.-M. was falling out of the chair, and Williamson had to bring it to Mother's attention. Then Mother just looked at D.S. and pointed at H.S.-M.

Burge also testified about Mother's previous contacts with DCF. On June 21, 2017, the agency received a report of Mother's lack of supervision and physical neglect of D.S. The lack of supervision was substantiated, and the physical neglect was affirmed. D.S. was placed in out-of-home care until September 2, 2018, when she was reintegrated. Then on April 4, 2019, there was another allegation of Mother's physical neglect of T.M. and D.S., which was affirmed. Two reports of physical neglect in April and June of 2019 were unsubstantiated. On September 19, 2019, DCF received a report that T.M. was living in a dirty home environment. He was admitted to the hospital for a wound on his foot. Those findings were affirmed. Burge's most recent contact with Mother was due to an August 15, 2022 report involving a lack of supervision of Mother's two-year-old niece, who was sharing the home with Mother and Mother's sister. Based on that report, Mother, Mother's sister, and the niece were all drug tested. Mother was positive for

7

methamphetamine while her sister was positive for cocaine, marijuana, and benzos. The child was negative.

The final case manager, Kathy Schmidt, testified that she supported termination of parental rights due to the continued positive methamphetamine results in Mother's hair follicle tests. She testified that Mother did not attend the final case plan meeting held January 9, 2023. In her short time as case manager, Schmidt requested that Mother submit to a walk-through of her house, provide a copy of the lease for the residence and proof of rental payments, and provide proof of employment. Mother did not comply with any of Schmidt's requests before the July 2023 hearing date. On the third day of the hearing, Mother texted a pay stub to Schmidt.

TFI provided Mother with three different parent partners—a person who at some point had his or her own children in DCF custody and was able to work reintegration successfully and be reunited with the children. These partners are intended to provide extra support for the parents and "bridge the gap between case managers and parents." Mother never contacted or utilized her first two parent partners and dismissed the third parent partner shortly after becoming acquainted.

Mother testified about her drug usage. She admitted using methamphetamine two days before H.S.-M. was born. She repeatedly denied using after that. She testified that she was still engaged in individual therapy with Sharp. Mother testified that she did not believe TFI workers were acting in her best interests. When asked if she believed her house was appropriate for the children she replied, "[H]onestly, I don't think that house is appropriate for anyone." Mother testified that she never failed to show up for a UA and never failed one.

At the conclusion of the hearing, the district court ordered the parties to submit proposed findings of facts and conclusions of law in writing. The district court then

adopted the joint proposed findings and conclusions of the State and the guardian ad litem (GAL). In its ruling, the district court terminated Mother's parental rights. The court found by clear and convincing evidence that Mother was unfit by reason of conduct or condition which rendered her unable to care properly for a child and the conduct or condition was unlikely to change in the foreseeable future. The court also found that it was in the children's best interests that Mother's rights be terminated. Mother timely appealed. While Father's rights were also terminated, he is not a party to this appeal.

ANALYSIS

A parent has a fundamental right recognized by the United States Constitution to parent his or her child. *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982). Before a parent can be deprived of the right to the custody, care, and control of the child, the parent is entitled to due process of law. *In re P.R.*, 312 Kan. 767, 778, 480 P.3d 778 (2021).

I.     MOTHER'S PROCEDURAL DUE PROCESS RIGHTS WERE VIOLATED, BUT REVERSAL
       IS NOT NECESSARY

Mother argues that the district court failed to determine whether K.S.A. 60-414(a) or (b) applied to the presumption in K.S.A. 38-2271(a)(5) and, by doing so, it denied Mother her procedural due process rights.

*Preservation*

Mother argues that she raised this issue in district court by including in her proposed findings of fact to the district court that K.S.A. 60-414(b) applied to the K.S.A. 38-2271(a)(5) presumption.

9

The State contends that this issue was not raised before the district court at the time of the court's ruling that adopted the proposed findings of the State and the GAL. Mother received a copy of the State and the GAL's proposed findings on October 27, 2023. The State's motion for finding of unfitness and termination of parental rights explicitly stated that the presumption(s) are K.S.A. 60-414(a) presumptions. At a November 13, 2023, hearing, the court stated that it was adopting the State and the GAL's proposed findings but did not explicitly reference K.S.A. 60-414. At that time, Mother did not object.

"In general, litigants must object to inadequate findings of fact and conclusions of law in order to give the trial court the opportunity to correct them. In the absence of an objection, omissions in findings will not be considered on appeal." *In re Guardianship of B.H.*, 309 Kan. 1097, 1107-08, 442 P.3d 457 (2019). Consequently, when a party does not object, we presume that the district court found all facts necessary to support its judgment.

Supreme Court Rule 6.02(a)(5) (2024 Kan. S. Ct. R. at 36) states that an appellant's brief must begin each issue with "a pinpoint reference to the location in the record on appeal where the issue was raised and ruled on. If the issue was not raised below, there must be an explanation why the issue is properly before the court." Although Mother did argue for the application of K.S.A. 60-414(b) in her proposed findings and conclusions of law, the district court did not adopt those findings, and Mother's counsel failed to object to the court's adoption of the State's and the GAL's proposed findings. And Mother never raised the issue in the district court of a due process violation based on the failure to explicitly determine whether K.S.A. 60-414(a) or (b) applied. The district court was therefore unable to rule on this issue.

10

"[C]onstitutional grounds for reversal cannot be raised for the first time on appeal." *Bussman v. Safeco Ins. Co. of America*, 298 Kan. 700, 729, 317 P.3d 70 (2014). There are several exceptions to this general rule, including:

> "'"(1) the newly asserted theory involves only a question of law arising on proved or admitted facts . . . ; (2) consideration of the theory is necessary to serve the ends of justice or to prevent [a] denial of fundamental rights"; or (3) the district court's judgment is correct for the wrong reason.'" *In re A.S.*, 319 Kan. 396, 399, 555 P.3d 732 (2024).

Under Rule 6.02(a)(5), an appellant must provide "an explanation why the issue is properly before the court" if the issue was not raised below. 2024 Kan. S. Ct. R. at 36. Mother's brief does contain a very short explanation that we can "'review claims of constitutional error for the first time on appeal when that's required to serve the ends of justice or to prevent the denial of a party's fundamental rights . . . [and] a parent's right to his or her child is a fundamental right . . . .'" Mother's assertion falls under the second exception. We therefore will decide this issue.

*Standard of Review*

"'The question of whether due process has been violated in a particular case is one of law, reviewable de novo on appeal.'" *In re B.H.*, 64 Kan. App. 2d 480, 488, 550 P.3d 1274 (2024).

*Discussion*

Under K.S.A. 38-2269(a), to terminate a parent's rights, the State must prove "by clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition

11

is unlikely to change in the foreseeable future." The district court may rely on one or more of the 13 statutory presumptions of unfitness outlined in K.S.A. 38-2271.

K.S.A. 38-2271(a)(5) provides a presumption of parental unfitness. It states:

"(a)    It is presumed in the manner provided in K.S.A. 60-414, and amendments thereto, that a parent is unfit by reason of conduct or condition which renders the parent unable to fully care for a child, if the state establishes, by clear and convincing evidence, that:

. . . .

(5)  the child has been in an out-of-home placement, under court order for a cumulative total period of one year or longer and the parent has substantially neglected or willfully refused to carry out a reasonable plan, approved by the court, directed toward reintegration of the child into the parental home."

K.S.A. 60-414 provides:

"Subject to K.S.A. 60-416, and except for presumptions which are conclusive or irrefutable under the rules of law from which they arise, (a) if the facts from which the presumption is derived have any probative value as evidence of the existence of the presumed fact, the presumption continues to exist and the burden of establishing the nonexistence of the presumed fact is upon the party against whom the presumption operates; (b) if the facts from which the presumption arises have no probative value as evidence of the presumed fact, the presumption does not exist when evidence is introduced which would support a finding of the nonexistence of the presumed fact, and the fact which would otherwise be presumed shall be determined from the evidence exactly as if no presumption was or had ever been involved."

In addition to the statutory factors in K.S.A. 38-2269(b) and (c), the district court also found that Mother was presumed to be unfit under K.S.A. 38-2271(a)(5) because the children were in out-of-home placement, under court order, for one year or longer, and Mother failed to carry out a reasonable plan, approved by the court, directed toward

12

reintegration of the children into the parental home. The district court did not make a finding on whether Mother rebutted or failed to rebut this presumption.

Mother argues the district court should have first determined whether the statutory presumption in K.S.A. 38-2271(a)(5) was either a K.S.A. 60-414(a) or (b) presumption. In support, Mother cites to *In re J.L.*, 20 Kan. App. 2d 665, 891 P.2d 1125 (1995). There, another panel held: "[I]n order for the presumption raised by K.S.A. 1994 Supp. 38-1585 to be applied in a constitutional fashion, the trial court must first determine whether it is a subsection (a) or subsection (b) presumption." 20 Kan. App. 2d at 681. If the court determines it is a subsection (b) presumption, "*any evidence* which would support a finding of fitness, including the uncorroborated testimony of a parent, will result in the disappearance of the presumption, and the burden of proving unfitness will once again be upon the State." 20 Kan. App. 2d at 681. However, "[i]f it is determined by the trial court to be a subsection (a) presumption, it will operate in the fashion described in the statute." 20 Kan. App. 2d at 681.

The district court's order of termination applying the presumption did not reference K.S.A. 60-414. Without addressing this omission, the State argues that subsection (a) applies to this case because the evidence had probative value of the existence of the presumed fact. The State's motion for termination of parental rights stated that subsection (a) applied to this case. Even so, *In re J.L.* holds that it is the district court that must determine whether it is an (a) or (b) presumption under K.S.A. 60-414. *In re J.L.*, 20 Kan. App. 2d at 681.

Here, the district court's failure to consider K.S.A. 60-414 before applying the statutory presumption is error but not reversible error. The district court's ruling terminating Mother's parental rights was also based on six statutory factors of unfitness under K.S.A. 38-2269. Any one of those factors, standing alone, may establish grounds for termination. K.S.A. 38-2269(f). Thus, since the evidence was sufficient to support the

13

district court's finding that Mother was an unfit parent under the statutory factors of unfitness, reversal is not required. See *In re J.S.*, 42 Kan. App. 2d 113, 119, 208 P.3d 802 (2009).

## II. SUFFICIENT EVIDENCE SUPPORTED THE DISTRICT COURT'S FINDING THAT MOTHER WAS AN UNFIT PARENT

*Standard of Review*

"Termination of parental rights will be upheld on appeal if, after reviewing all the evidence in the light most favorable to the prevailing party, the district judge's fact-findings are deemed highly probable, i.e., supported by clear and convincing evidence." *In re Adoption of Baby Girl G.*, 311 Kan. 798, 806, 466 P.3d 1207 (2020). When reviewing these decisions, this court does not "weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact." 311 Kan. at 806.

*Discussion*

Under K.S.A. 38-2269(a), to terminate a parent's rights, the State must prove "by clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future." The district court may rely on the list of nonexclusive factors in K.S.A. 38-2269(b)-(e) to determine whether a parent is unfit. See *In re E.L.*, 61 Kan. App. 2d 311, 323, 502 P.3d 1049 (2021). A single factor may be enough to terminate parental rights. K.S.A. 38-2269(f); 61 Kan. App. 2d at 323. Termination requires evidence of unfitness in the present and the foreseeable future. K.S.A. 38-2269(a); 61 Kan. App. 2d at 323.

Here, the district court found Mother unfit based on six statutory factors:

1.  K.S.A. 38-2269(b)(3)—"use of intoxicating liquors or narcotic or dangerous drugs of such duration or nature as to render the parent unable to care for the ongoing physical, mental or emotional needs of the child";

2.  K.S.A. 38-2269(b)(4)—"physical, mental or emotional abuse or neglect or sexual abuse of child";

3.  K.S.A. 38-2269(b)(7)—"failure of reasonable efforts made by . . . agencies to rehabilitate the family";

4.  K.S.A. 38-2269(b)(8)—"lack of effort on the part of the parent to adjust the parent's circumstances, conduct or conditions to meet the needs of the child";

5.  K.S.A. 38-2269(c)(3)—"failure to carry out a reasonable plan approved by the court directed toward the integration of the child into a parental home"; and

6.  K.S.A. 38-2269(c)(4)—"failure to pay a reasonable portion of the cost" for care of the child.

Mother asserts that a rational fact-finder could not have found the facts on which the district court relied to be highly probable. K.S.A. 38-2269(f) provides: "The existence of any one of the above factors standing alone may, but does not necessarily, establish grounds for termination of parental rights." Accordingly, we choose to review four of the six factors considered by the district court.

1.  *K.S.A. 38-2269(b)(3)*

The record here establishes that Mother has continually used methamphetamine throughout the duration of the case. Despite submitting over 60 negative UAs, Mother's hair follicle tests were consistently positive for methamphetamines. Every hair follicle

15

test, but one, was positive. The one negative test was on June 6, 2023, after the termination proceedings had begun. Mother also had several no-shows for testing, which were considered positive.

Mother argues that when viewed in conjunction with the UAs, the hair follicle tests are insufficient to prove that she used drugs excessively. She also argues that she was successfully discharged from outpatient drug treatment. The district court did not find these arguments persuasive because Prairie View had not conducted any type of drug testing during the treatment, nor was the drug counselor who was providing therapy to Mother aware that Mother's hair follicle tests were consistently positive for methamphetamines.

Hogoboom, the Director of Operations for the drug testing center, testified that she has seen several other cases with negative UA tests and positive hair follicle tests. While she admitted that it was unusual, she said it was "not unheard of." Also of significance is that Mother purposely tried to evade the hair follicle testing by shaving her head during the case. Mother admitted she used methamphetamine on May 28, 2021, two days before H.S.-M. was born. And she tested positive for methamphetamine on June 16, 2023, after the termination proceedings had begun. There was also evidence of Mother participating in "hotboxing" with Father, who was known to use illegal substances.

Upon review of the evidence in the light most favorable to the State, a rational fact-finder could have found it highly probable that Mother has consistently used methamphetamines throughout the case rendering her unable to care for the ongoing physical, mental, or emotional needs of T.M. and H.S.-M.

2. *K.S.A. 38-2269(b)(7)*

"'The purpose of the reasonable efforts requirement is to provide a parent the opportunity to succeed, but to do so the parent must exert some effort.'" *In re M.S.*, 56 Kan. App. 2d 1247, 1257, 447 P.3d 994 (2019). This record shows that the agencies' efforts to rehabilitate the family were reasonable. Mother was provided with case supervision, treatment assistance, therapy, parent partners, random drug testing, as well as care of the minor children. In addition, Taliferro testified that she offered to help Mother find more suitable housing, but Mother refused. In fact, TFI provided three parent partners to work with Mother. Mother, however, refused to maintain contact with any of them or to use their assistance.

Mother argues that she completed the case plan tasks and that TFI still refused to increase her visitation time. She fails to address the fact that her visitation time was based on her continued methamphetamine usage. Mother also argues that TFI refused to conduct further home visits to verify the improvements made to her house. Yet the workers did not feel safe in her house due to a threat Mother had made. And she fails to address the fact that Taliaferro offered to help Mother find more suitable housing, which Mother refused.

The evidence here supports the district court's finding that reasonable efforts by appropriate agencies to rehabilitate the family had failed. There was clear and convincing evidence that TFI provided reasonable efforts for Mother to succeed in working toward reintegration.

3. *K.S.A. 38-2269(b)(8)*

The children were removed from the home on June 3, 2021. Mother had over two years to work on her case plan tasks before her rights were terminated on November 13, 2023.

Mother argues that she completed the case plan tasks. She faults TFI for failing to provide financial assistance in determining whether environmental factors at her house were causing her to test positive for methamphetamine use and for failing to conduct a second walk-through of the home. Mother fails to address the fact that TFI offered to assist her in finding another home, but she refused. And she fails to address the fact that Taliferro did not conduct a second walk-through due to the threat Mother made against her. Finally, she admitted at the termination hearing that her house was not safe for anyone.

Mother also continued living with Father despite being advised that, to reintegrate with her children, she was not to live with Father nor was she to maintain a relationship with him because he was actively using drugs and not working on the case plan tasks. Since September 2021, Taliaferro had told Mother that her relationship with Father was impeding reintegration, but, as of April 26, 2022, Mother and Father were still living together in Burns. While there is evidence that, after May 2022, Mother and Father lived separately, photographs taken on June 6, 2022, of Mother's truck parked outside Father's house led case workers to believe Mother continued to spend time with Father. Williamson also testified that Mother told a therapist on May 24, 2022, that she was recently "hotboxing" in a vehicle with Father.

The district court relied on the fact that Mother's hair follicle tests continued to be positive. Even though Mother asserted this was due to environmental factors, the other two individuals living in the house tested negative for methamphetamines.

18

The district court also made findings that, during her visitation with the children, Mother consistently engaged in a course of conduct that put the children at risk of harm, ranging from poor judgment to disregarding staff instructions. Mother consistently body-shamed D.S., used foul language, and ignored directives to stop speaking that way in front of the children. Mother regularly left the caretaking of H.S.-M. to the older child, D.S., including failing to intervene when H.S.-M. was falling out of a rolling office chair, leaving D.S. to handle the situation.

Viewing the evidence in a light most favorable to the State, there was clear and convincing evidence of a lack of effort on Mother's part to adjust her circumstances to meet T.M.'s and H.S.-M.'s needs.

4. *K.S.A. 38-2269(c)(3)*

Mother asserts that she completed all seven case plan tasks assigned to her. She listed:

> "(1) obtain a mental health evaluation and follow the recommendations; (2) obtain a drug and alcohol evaluation and follow the recommendations; (3) obtain and maintain stable housing; (4) obtain and maintain stable employment; (5) attend age-appropriate parenting classes; (6) submit to random UA tests; and (7) sign any releases necessary for TFI to obtain any relevant information."

But as the State points out, Mother did not complete the case plan goal regarding drug treatment. Prairie View successfully discharged Mother from its outpatient treatment, but it was relying on Mother's self-reporting to determine whether she was abstaining from drug use and was unaware of her continued positive hair follicle tests.

Mother did eventually establish a home away from Father, but even by Mother's own testimony, the house was unsafe. Despite repeated requests, Mother never provided

19

TFI with a copy of a lease or the landlord's name and refused assistance in finding more suitable housing. As for verification of employment, Mother was asked repeatedly for several months to provide pay stubs as proof of her employment. She failed to do so until the termination proceedings were already underway.

Considering the evidence in the light most favorable to the State, a rational fact-finder could have found it highly probable that Mother was unfit based on this factor.

*Conduct or condition of unfitness unlikely to change in foreseeable future*

"After finding a parent is unfit to properly care for a child, the court must then determine whether there is clear and convincing evidence that the parent's conduct or condition of unfitness is unlikely to change in the foreseeable future. K.S.A. 38-2269(a)." *In re D.G.*, 319 Kan. 446, 459, 555 P.3d 719 (2024). The district court may look to a parent's past conduct as an indicator of future behavior. *In re Price*, 7 Kan. App. 2d 477, 483, 644 P.2d 467 (1982). When assessing the foreseeable future, we must use "'child time'" as the measure. See *In re N.A.C.*, 299 Kan 1100, 1106, 329 P.3d 458 (2014). The Revised Kansas Code for Care of Children, K.S.A. 38-2201 et seq., recognizes that children experience time differently than adults and that different perception typically requires a prompt, permanent disposition. K.S.A. 38-2201(b)(4); *In re M.B.*, 39 Kan. App. 2d 31, 45, 176 P.3d 977 (2008).

As the State points out, Mother failed to change her conduct or circumstances in the two years her children were in state custody. Mother continually tested positive for methamphetamine use and continually denied using methamphetamines.

Considering the evidence in the light most favorable to the State, a rational fact-finder could have found it highly probable that Mother's conduct or condition of unfitness was unlikely to change in the foreseeable future under K.S.A. 38-2269(a).

20

III.	THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN FINDING THAT TERMINATION WAS IN THE BEST INTERESTS OF THE CHILDREN

After the district court makes a finding that a parent is unfit, the district court then must determine by a preponderance of the evidence whether the termination of parental rights is in the child's best interests. See K.S.A. 38-2269(g)(1) (best interests); *In re R.S.*, 50 Kan. App. 2d 1105, 1116, 336 P.3d 903 (2014) (preponderance of evidence). "K.S.A. 38-2269(g)(1) expressly identifies the physical, mental, and emotional health of the child as the primary factors a district court should consider in making its best-interests determination." *In re D.G.*, 319 Kan. at 461-62. "This assessment balances the negative effects of termination on the child with the benefits of 'permanency' in a different home environment." *In re D.M.*, No. 122,561, 2020 WL 5490880, at *4 (Kan. App. 2020) (unpublished opinion).

*Standard of Review*

We review the district court's best-interests determination for abuse of discretion. "A district court abuses its discretion if no reasonable person would agree with the district court, or the court premised its decision on a factual or legal error." *In re E.L.*, 61 Kan. App. 2d at 330.

*Discussion*

When determining whether a district court's decision was premised on a factual error, another panel of this court specifically held that the preponderance-of-the-evidence standard of proof applies to best-interest findings in the district court. *In re R.S.*, 50 Kan. App. 2d at 1116. But our Supreme Court "has yet to decide whether the lower preponderance-of-the-evidence or the higher clear-and-convincing standard of proof

applies to factual findings made under [K.S.A. 38-2269](g)(1)." *In re D.G.*, 319 Kan. at 463. Regardless, Mother does not assert the district court made a factual error.

The district court's findings on best interests consisted of the following: "Considering the physical, mental or emotional health of the child, termination of parental rights is in the best interests of the child named above and the physical, mental or emotional needs of each child would best be served by termination of parental rights."

Mother argues "that the fault for reintegration not occurring lies more with TFI than with herself." She therefore argues that the district court's finding that termination was in the best interests of the children was arbitrary and unreasonable.

There was ample evidence presented to the district court that Mother continued to use methamphetamine. In addition, she had been unable to obtain verifiable employment or suitable housing to reintegrate with the two children. A reasonable person could agree with the district court's conclusion that, in considering each child's physical, mental, or emotional health, termination of Mother's parental rights was in the children's best interests. See K.S.A. 38-2269(g)(1). Mother has not alleged that the district court's conclusion was based on any factual or legal error. It was not an abuse of discretion for the district court to find termination of Mother's parental rights was in the best interests of the children.

Affirmed.